# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 C 2078 | **DATE** | 2/16/2001 |
| **CASE TITLE** | United Phosphorus, Ltd, et al., vs. Angus Chemical Company, et al., | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on defendants' motion(s) to dismiss for lack of subject matter jurisdiction. The Angus and Gupta/Lupin defendants' motions to dismiss for lack of subject matter jurisdiction and for summary judgment [401-1, 407-1, 407-2, 413-1] are hereby granted. The cause is dismissed as follows: Counts I and II of the second amended complaint are dismissed with prejudice and Count III of the second amended complaint is dismissed without prejudice to re-file Count III in State Court. Plaintiffs' motion for partial summary judgment [418-1, 421-1] are denied without prejudice as moot.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 4 | | Document Number |
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | FEB 20 2001 | | | |
| | Notified counsel by telephone. | | date docketed | | | 468 |
| | Docketing to mail notices. | | CM | | | |
| | Mail AO 450 form. | | docketing deputy initials | | | |
| | Copy to judge/magistrate judge. | | 2/16/2001 | | | |
| | | | date mailed notice | | | |
| SM | courtroom deputy's initials | | | SM | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| UNITED PHOSPHORUS, LTD., an Indian corporation; SHROFF'S UNITED CHEMICALS, LTD., an Indian corporation; and J.C. MILLER & ASSOCIATES, INC., an Illinois corporation,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>ANGUS CHEMICAL COMPANY, a Delaware corporation; ANGUS CHEMIE GmbH, a German corporation; the ESTATE of FREEMAN HUGHES through its representative Yvonne Hughes; OLLIE W. CHANDLER; LOWELL PALS; GARY W. GRANZOW; D.B. GUPTA; and LUPIN LABORATORIES, LTD., an Indian corporation,<br><br>　　　　Defendants. | ）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）　Case No. 94 C 2078<br>）<br>）　Magistrate Judge Ian H. Levin<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>） |

MEMORANDUM OPINION AND ORDER

Before the court are Defendants' motion(s) to dismiss for lack of subject matter

jurisdiction (pursuant to Fed.R.Civ.P.12(b)(1)) as to Counts I and II of the second amended

complaint.

INTRODUCTION

Plaintiffs are (a) an Indian chemical manufacturer called United Phosphorus, Ltd.

("UPL"), (b) an Indian company entitled Shroff's United Chemicals Ltd. ("SUCL") (Shroff Dep.

25), ("the Indian Plaintiffs") and (c) an American firm, J.C. Miller & Associates ("JCM"), which

once had an interest in a joint venture that wanted to sell technology to the Indian Plaintiffs. Defendants are (a) Angus Chemical Corporation and its corporate officers, Freeman Hughes, Ollie Chandler, Lowell Pals, Gary W. Granzow (collectively "Angus"), (b) Angus Chemie GmbH ("Chemie"), and (c) Lupin Laboratories, Ltd. and its officer and owner D.B. Gupta (collectively "Lupin"). Counts I and II of the second amended complaint, essentially, allege that Defendants attempted to monopolize, monopolized and conspired to monopolize the market for certain chemicals in violation of § 2 of the Sherman Antitrust Act. 15 U.S.C. § 2.

Defendants threshold argument is that the court lacks subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA"), which limits application of the Sherman Act to conduct with a "direct, substantial, and reasonably foreseeable effect" on *domestic commerce*. 15 U.S.C. § 6a.

## BACKGROUND FACTS

The following was expressed by the District Court in ruling on a motion under the original complaint herein:

> India currently has the greatest incidence of tuberculosis in the world. The primary pharmaceutical drug used in India to cure this potentially fatal illness is Ethambutol. Two chemicals, 2-Amino-1 Butanol ("AB"), the key ingredient of Ethambutol, and 1-Nitro-Propane ("1-NP"), the raw material used to make AB, are the subjects of this litigation.
>
> To make Ethambutol, Indian chemical laboratories, including Defendant Lupin, use AB, which they buy from Defendant Chemie, currently the world's only manufacturer of AB. Chemie, a German subsidiary wholly owned by Defendant Angus, uses 1-NP as raw material to manufacture AB at its plant in Germany. Angus, a Delaware Corporation in the business of manufacturing and selling chemical products, makes 1-NP at a plant in Sterlington, Louisiana, and is presently the world's only manufacturer of 1-NP. Mem. Op. & Order, 1994 WL 577246, *1 (N.D. Ill. Oct. 18, 1994).

The lawsuit in this case stems from prior trade secret litigation between several of the parties. In the early 1990's, the Indian Plaintiffs began to consider manufacturing AB. The Indian Plaintiffs planned to acquire the technology for making AB, and its raw material 1-NP, from Dr. John Miller (owner of JCM) who also was the former Vice President of Research and Development for Angus (makers of AB and 1-NP). While at Angus, Miller supervised Angus' propriety efforts to improve its AB processes and had ongoing access to the manufacturing process details for Angus' products.

Defendants position was as follows: While Rajju Shroff (the principal of Indian Plaintiffs) worked to acquire AB technology from Dr. Miller, he concealed Miller's identity and background from his own government by filing an official application to the Indian government falsely declaring that the technology for the AB process would be acquired from a different scientist, Dr. Phillip Adams. Adams Dep. 99-101, 133. Shroff, assertedly, withheld Miller's involvement in the project stating that Angus didn't "know that we [Shroff and Miller] are in touch. They still think it is Dr. Phil Adams. Letter from Shroff to Miller (July 30, 1991) (DX 41).

Avowedly, as soon as Angus learned that Shroff would be obtaining AB technology from Miller, Angus filed suit in the Circuit Court of Cook County ("the Cook County Action") to enjoin Miller from misappropriating its trade secrets. Two years later, when Angus was faced with a discovery ruling that would have required it to disclose the very details of the technology it sued to protect, Angus voluntarily dismissed its own suit.

The following year, in 1994, Plaintiffs initiated this action challenging Angus' pursuit of the Cook County Action. The Indian Plaintiffs allege that, but for Angus' initiation of the Cook

County Action, Plaintiffs would have sold AB as well as other chemicals for profit. Moreover, JCM claims that it would have sold technology to the Indian Plaintiffs and others. Thus, in the second amended complaint, the Indian Plaintiffs alleged, *inter alia,* that they intended to manufacture AB, 1-NP and certain other specified chemicals and that Defendants used various anti-competitive means to thwart Plaintiffs' plans.

## RELEVANT STATUTE

The FTAIA, states:

Sections 1 to 7 of this title (Sherman Act) shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –

    (1)    such conduct has a direct, substantial, and reasonably foreseeable effect –

        (A)    on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

        (B)    on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

    (2)    such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1) (B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States. 15 U.S.C. § 6a (1982).

## ANALYSIS

Defendants move to dismiss Plaintiffs' second amended complaint for lack of subject

matter jurisdiction.[1]

## I. Subject Matter Jurisdiction

### A. Direct, Substantial, And Reasonably Foreseeable Effect On Domestic Commerce.

Defendants threshold argument is that the court lacks subject matter jurisdiction because Plaintiffs have failed to demonstrate that Defendants' alleged antitrust conduct has a "direct, substantial, and reasonably foreseeable effect" on United States commerce as required by the FTAIA.

Section 1 of the Sherman Act prohibits conspiracy "in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Section 2 of the Sherman Act prohibits monopolization and attempted monopolization "of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Section 6a, *supra*, which was added to the Sherman Act in 1982, sets forth the criteria for determining United States antitrust jurisdiction over international business transactions. 15 U.S.C. § 6a.

In 1982, Congress enacted the FTAIA as an amendment to the Sherman Act to clarify the extraterritorial reach of the federal antitrust laws. *O.N.E. Shipping, Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 451 (2d Cir. 1987); Roger P. Alford, "The Extraterritorial Application of Antitrust Laws: A Postscript on Hartford Fire Insurance Co. v. California," 34 Va.J.Int'l L. 213, 216 (1993). The purposes of the FTAIA, as set forth in its legislative history,

---

[1] In this regard:
"The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir. 1999) (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993) (per curiam)).

are to "encourage the business community to engage in efficiency producing joint conduct in the export of American goods and services" and to amend the Sherman Act to create a unitary statutory test to determine whether American antitrust jurisdiction exists over certain international transactions. H.R. Rep. No. 686, 97th Cong., 2d Sess., reprinted in 1982 U.S. Code Cong. & Ad. News 2487.

Congress enacted the FTAIA because it believed that American jurisdiction over international commerce should be limited to transactions that affect the American economy. *Hartford Fire Ins.*, 509 U.S. at 796, n.23, 113 S.Ct. 2891, 125 L.Ed.2d 612 (*citing* H.R. Rep. No. 686, 97th Cong., 2d Sess., reprinted in 1982 U.S. Code Cong. & Ad. News 2487; Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 236'a (1992). Congress believed that "the concern of the antitrust laws is protection of *American* consumers and *American* exporters, not foreign consumers or producers." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 272h2 (1997) (emphasis in original). With this in mind, Congress amended the Sherman Act by passing the FTAIA so that jurisdiction over foreign commercial conduct would not be exercised unless such conduct had a "direct, substantial, and reasonably foreseeable effect" on United States commerce. Moreover, Congress intended that the antitrust laws would not be "triggered . . . by any minor impact," but only by "direct, substantial, and reasonably foreseeable" effects on United States commerce. Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272h2 (1997).

Under the FTAIA, the proscriptions of the Sherman Act apply to trade or commerce with foreign nations, other than import transactions, only when the conduct providing the basis for the claim has a direct, substantial and reasonably foreseeable anticompetitive effect on United States domestic commerce. The amendment was clearly intended to exempt from United States

6

antitrust law conduct that lacks the requisite domestic effect, "even where the anti-trust conduct originates in the United States or involves American-owned entities operating abroad." *Optimum, S.A. v. Legent Corp.*, 926 F.Supp. 530, 532 (W.D. Pa. 1996).

The FTAIA does not, however, preclude all persons or entities injured abroad from recovering under United States antitrust laws. When the activity complained of has a demonstrable effect on United States domestic commerce, foreign corporations injured abroad may seek recovery under the Sherman Act. As the House Report states, the FTAIA "preserves antitrust protections in the domestic marketplace for all purchasers, regardless of nationality or the situs of the business. . ." H.R. Rep. No. 686, 97th Cong., 2d Sess., reprinted in 1982 U.S. Code Cong. & Ad. News 2487.

The effect on domestic commerce required by the FTAIA must be sufficient to "give[] rise to a claim" under the Sherman Act. 15 U.S.C. § 6a(2). A plaintiff's showing of domestic effects must include a demonstration of "antitrust injury to the market or to competition in general, not merely injury to individuals or individual firms." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 815 (9th Cir. 1988); *see, e.g., Blackburn v. Sweeney*, 53 F.3d 825, 829 (7th Cir. 1995) (antitrust claim requires injury due to "effects . . . on competition"); *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 486 (D.C. Cir. 1996) (antitrust claim requires "anticompetitive impact on the market as a whole"). Moreover, conduct on American soil is not always sufficient to prove effect on domestic commerce because it is the situs of the effect, not the conduct, which is crucial. *Liamuiga Tours, Div. Of Caribbean Tourism Consultants, Ltd. v. Travel Impressions, Ltd.*, 617 F.Supp. 920, 924 (E.D.N.Y. 1985).

As discussed hereinafter, the court finds that the alleged conduct underlying Plaintiffs'

claims can have had no effect on any United States commerce in the chemicals that Plaintiffs state they would have manufactured. Discovery has revealed that there is only one chemical as to which Plaintiffs took even preliminary steps – AB, which Plaintiffs did not intend to sell in the United States. Plaintiffs may have considered making 1-NP, but only for their own use in manufacturing AB. As for the other chemicals named in the second amended complaint, the record shows, at most, that Plaintiffs had a conclusory intent to think about making them at some point in the future. Respectfully, conjecture alone, however, cannot establish the necessary domestic effect under the FTAIA, as a matter of law. *McElderry v. Cathay Pacific Airways, Ltd.*, 678 F.Supp. 1071, 1078 (S.D.N.Y. 1988) (FTAIA requires more than "speculative" domestic effects). Plaintiffs' "failure to establish any anticompetitive domestic effect [is] jurisdictional," implicitly fails to meet the requisite "direct, substantial, and reasonably foreseeable effect" test and requires dismissal of their antitrust claims. *Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1544 (9th Cir. 1994).

**B.      A Showing Of The Requisite Effect On Domestic AB Sales Has Not Been Made.**

In late 1990 and early 1991 Plaintiffs decided to manufacture AB in Vapi, India. 2d Am. Cmplt. ¶ 55. Plaintiffs planned to manufacture AB by using technology developed through a joint venture called Miller-Deltachem, in which JCM was one of the principals. *Id.* ¶¶ 57, 59.

Plaintiffs first allege that Defendants used various anticompetitive means to interfere with Plaintiffs' AB plans, including making threats against Plaintiffs' potential AB customers and initiating a "sham" state court lawsuit (the Cook County action) in 1991 to prevent JCM's principal, Miller, (Angus' former Vice President for Research and Development) from divulging

Angus' trade secrets. 2d Am. Cmplt. ¶¶ 85-89, 97(b)-(e). Defendants maintain, however, that even if Plaintiffs' allegations of misconduct have merit, the evidence demonstrates that there could have been no effect on domestic commerce.

### 1. Plaintiffs Would Not Have Sold AB In The United States.

Plaintiffs threshold argument is that they would have sold AB in the United States if the Defendants had not intentionally interfered with their efforts to manufacture AB. Defendants, however, argue that Plaintiffs never intended to sell AB in the United States and that Plaintiffs, even if they had wanted to, could not have made any AB sales in the United States. Defendants further assert that even if their alleged scheme to prevent the Plaintiffs from manufacturing AB had been successful, it could have had no effect on domestic commerce, must less the required "direct, substantial, and reasonably foreseeable effect" sufficient to give rise to a cause of action under the Sherman Act. They assert that the FTAIA requires dismissal of Plaintiffs' claims.

### a. Plaintiffs Did Not Have An Intent (Or Ability) To Sell AB In The United States.

The evidence in this case indicates that Shroff began to develop plans to manufacture AB after Phillip Adams (Shroff's consultant) told him that it was a "good project for India." Shroff Dep. 35-36. Moreover, Anant Thakore, a past president of the Indian Drug Manufacturer Association, who has been involved in the Indian AB business since the early 1970s and who is considered to be "the best authority in India" on the subject, testified that Indian buyers purchase 90-95% of the world's AB supply. Thakore Dep. 38, 285-86, 328, 390; *see also id.* at 63 ("potential customers [for AB] were anyone who makes ethambutol in India").

The record demonstrates that Miller learned about Shroff's companies at a meeting with

Adams and one of Shroff's chemical brokers, Eugene Klim. At the meeting, Miller told Adams

and Klim that he "was interested in talking with [UPL] because he had business that would be

very good in India," and that "he had a process for making [AB] whose market is in India." Klim

Aff. ¶ 9 (DX 140); Klim Dep. 45-47. Moreover, Adams told Miller that he would pass on

Miller's card to Shroff because "Miller said that the market was in India" and "we had no need

for [AB] in this country. Adams Dep. 83; *see also id.* at 81-82 (Miller said that "the AB product

would be used in India.") Klim himself had "no interest" in AB because, as he swore in an

affidavit submitted in the Cook County action, "the market for it is in India with no U.S.

business." Klim Aff. ¶ 11 (DX 140); *see also* Klim Dep. 54, 56-57.

The day after the meeting with Miller, Klim alerted Shroff to an opportunity to license a

"proven process" to manufacture a product for which there is "an ongoing requirement in India

for 1.5 million lbs." Letter from E. Klim to R. Shroff (Feb. 8, 1991) (DX 2); *see* Klim Dep. 71-

72; Shroff Dep. 40-42. That product turned out to be AB and the source of the technology was

Miller-Deltachem. Shroff Dep. 42; 2d Am. Cmplt. ¶ 59. Klim's report to Shroff on the Indian

demand for AB was based on Miller's estimate of "the value of this whole thing." Klim Dep. 72.

A subsequent letter to Shroff, which Miller drafted for Klim, stated that the demand for AB was

"1.5 million lbs used in India" and [a]nother potential 1.5 million lbs in China," and that "this

product would be used exclusively in Asia (especially India)." Letter from E. Klim to R. Shroff

(Feb. 21, 1991) (DX 4); *see* Facsimile from J. Miller to E. Klim (undated) (DX 143); Miller Dep.

144; Klim Dep. 82; Shroff Dep. 52, 55. The Miller/Klim letter makes no mention of any

possible use for AB in the United States.

Two months later, Shroff advised Miller that "there is [a] reasonably good market in

India based upon his company's evaluation of "[p]ublished import figures" from the Indian government. Letter from R. Shroff to J. Miller (Apr. 18, 1991) (DX 6); Shroff Dep. 64, 67. Miller responded with a letter describing the "market for AB in India" and projecting annual sales and gross profits for UPL based on the assumption "that UPL pursues only the India AB potential" and not also "the Chinese AB market." Letter from J. Miller to R. Shroff (Apr. 22, 1991) (DX 7); *see* Shroff Dep. 71-72. Neither letter mentions any possibility of selling AB in the United States.

Shroff's plans for the size of his AB plant confirm that Plaintiffs' production and sale of AB was to be limited to India. The Indian Plaintiffs' Application for Foreign Collaboration submitted to the Indian government estimated the Indian Plaintiffs' annual production of AB in metric tons per year, assuming that the plant would not reach "full capacity" until its third year of operation. Application at 4 (DX 8); *see* Shroff Dep. 78, 132-33. "Full capacity" for Shroff meant 1000 metric tons of AB per year, which was precisely his estimate of the annual demand for AB in India:

> Q: So your estimate was you planned to build a plant with an annual capacity of 1,000 metric tons of AB based upon your assessment that the demand in India for AB was approximately that?
>
> A: Yeah.

Shroff Dep. 134.

The fact that Plaintiffs' AB plans were limited to non-United States markets is further demonstrated by Plaintiffs' intent to sell AB for use only in manufacturing ethambutol, which is not made in the United States.[2] Moreover, Shroff knows of no "other uses for AB except for the

_____

[2]It appears no company has manufactured ethambutol in the United States during the entire period covered by Plaintiffs' claims. Little Aff. ¶ ¶ 4, 7.

manufacture of ethambutol." Shroff Dep 147; *see also id.* at 773 ("AB that United Phosphorus might undertake to make would be used for the production of Ethambutol"). Miller also denied any knowledge that "Shroff or his companies planned to do anything with AB other than to sell it to ethambutol makers." Miller Dep. 405. Moreover, Plaintiffs' litigation consultant Peter Kizuik, who was formerly sales manager for nitroparaffins at Angus' competitor, W.R. Grace, knows of no application for AB other than the production of ethambutol. Kizuik Dep. 49, 51, 104.

The record further demonstrates that Plaintiffs would not have sold AB to the Italian facility of American Cyanamid or its subsidiary Lederle. Angus DC Br. 12, 14-16. During the period covered by Plaintiffs' lawsuit, the Lederle division of the American Home Products (formerly a division of American Cyanamid), was the only company in the world, that had FDA approval to sell ethambutol domestically. Lederle imported ethambutol into the United States from Italy, where it made ethambutol using an AB intermediate that it buys in India. *Id.* ¶ 7; *see also* Gupta Dep. 122-24; 430-31; 432-33; Leffler Dep. 492 (aside from Lederle, "[n]obody else sells" ethambutol in the United States). The record shows that the very small amount of AB that was sold in this country during the relevant time period was used solely as an ingredient in a product for making rocket motors which was unrelated to ethambutol (the only use of AB for which Plaintiffs were aware.)

Plaintiffs allegation that they would have sold AB to American "laboratory supply houses" (Pls. DC Br. 11 n.2, 12, 14-15) and that "there was every reason to think that" Miller eventually would have told Shroff about supply houses is not supported by the record. Pls. DC Br 12 n. 5. The record demonstrates that Shroff had no plans to sell AB to supply houses, did not know about this outlet for AB sales, and had no interest in it. Clearly Plaintiffs had no intention

of selling AB to American supply houses because neither Miller nor Shroff ever had any discussions with a single American supply house. Miller Dep. 413: Shroff Dep. 144-45, 161-62. Rather, as of the documents and testimony reveal, Plaintiffs intended to sell AB to ethambutol makers abroad. The record in the case reveals only that Miller's former partner Burkholder "may have" talked to supply houses about AB (see Pl.'s DC Br. 27). Miller testified that Burkholder "may have mention [AB] . . . [I]t's certainly a possibility. I don't know." Miller Dep. 543-44.

The record further demonstrates that if Plaintiffs could have sold to supply houses, such sales would not amount to any kind of "substantial effect" on domestic commerce. Plaintiffs' catalogues indicate that supply houses sell AB in tiny volumes – offering AB in 1-gram to 500-gram quantities as effective prices ranging from $142 to $18,600 per kilogram. See Pls. Exs. A, B. In comparison, Angus sold AB to 3M in 1994 for $15.76 per kilogram. (DX 296) The record clearly indicates that AB is not purchased in significant quantities from supply houses.

This court finds that based on the record that Plaintiffs had no actual plans to sell AB in this country and that there would have been no significant AB sales opportunities for Plaintiffs in this country even if they had tried to sell AB here. For instance, Miller testified that he "had no conversation with any potential customers for AB in the United States." Miller Dep. 413. Moreover, Shroff testified that he and his "marketing man" spoke with ten to twelve potential AB customers, all of which were located in India. Shroff Dep. 144-45, 161-62. Plaintiffs have put forth no evidence tending to show that, but for the claimed antitrust violations, they would have sold AB domestically.

It is clear that Plaintiffs cannot carry their burden of showing a "direct, substantial, and reasonably foreseeable effect" on domestic commerce under the FTAIA  As Plaintiffs' own liability expert agreed, "any effect upon United States commerce, based on what [he has] seen

with respect to AB sales" would be "less than substantial." Leffler Dep. 475-76.

### b. The Only Domestic AB Buyer Would Not Have Purchased AB From Plaintiffs.

While Plaintiffs assert that they would have sold AB in the United States, Defendants argue that they would have found no buyers.

The evidence indicates that during the time period covered by Plaintiffs' claims, 3M was the only customer in the United States that purchased AB. AB Customer Sales 1992-1994 (Ex. A); Littel Aff. ¶¶ 5-7 (Ex. L). Plaintiffs' expert acknowledged that "the only AB that's sold in the United States is to 3M." Leffler Dep. 443; *see also* Angus Off-Schedule Price Authorization (eff. Jan. 1, 1994) (DX 296) (all AB other than AB sold to 3M "is sold outside the United States").

Dr. Anthony Manzara, Division Scientist at 3M, testified that 3M purchases "very small amounts" of AB which is used by others in the manufacture of rocket motors. Manzara Dep. 25-26, 29. Between 1992 and 1994, 3M purchased less than 0.4% of the world's AB production manufactured for sale, with 1994 sales to 3M totaling under $25,000 (representing 0.16% of all sales and 0.14% of total volume.) AB Customer Sales 1992-1994 (Ex. A); Littel Aff. ¶ 5 (Ex L). Dr. Leffler characterized Angus' AB sales "in the United States [as] trivial. Leffler Dep. 467.

The record indicates that this small amount of AB business would not have been available to Angus' competitors. For example, 3M has never conducted any formal bidding for its AB purchases and it have never solicited offers from other AB suppliers, even when W.R. Grace, a well-know Angus competitor, offered AB for sale. Manzara Dep. 31, 45. Dr. Manzara explained that 3M purchases Angus' AB because of its "quality, purity and general reliability," that 3M is contractually bound to give its customers six-months notice of any change in its AB supplier, and

that changing 3M's AB supplier entailed a risk of producing an inferior product, which could "jeopardize 3M's AB supplier relationship" with its customers. *Id.* at 32-35, 44-45.

As a result, 3M's AB purchases are "too small – and the risk and effort required to switch . . . are too great – for 3M to change its AB supplier, as long as Angus supplies good quality product on a timely delivery schedule without unreasonable price increases." *Id.* at 46. Dr. Manzara testified that the risks and costs of changing AB supplier's "would overwhelm any possible savings." *Id.* at 46. He further stated that even if Angus "had doubled the price" of its AB, "it probably would not have been a major concern" to 3M. *Id.* at 114. Furthermore, even if a new supplier (like Plaintiffs) offered to cut Angus' AB prices in half, 3M "probably wouldn't be interested." *Id.* at 139.

This court finds that 3M would not have purchased AB from Plaintiffs and consequently, there would be no applicable "direct, substantial and reasonably foreseeable effect" on domestic commerce.

### c. Plaintiffs Cannot Bootstrap By Claiming Effects On Domestic Ethambutol Sales.

Defendants assert that Plaintiffs cannot claim domestic injury by supposing that their exclusion from the Indian AB business had an effect on domestic sales of ethambutol. Any alleged effect would not result in an injury to Plaintiffs because they have not claimed that they either (1) intended to make ethambutol, or (2) were prevented from making a single ethambutol sale. Moreover, during the relevant time period, Lederle had the required FDA authorization to provide ethambutol to domestic consumers.

The record indicates that there is no factual basis by which Plaintiffs can claim that there is a link between alleged misconduct in claimed foreign AB markets and the supply or price of

Lederle's ethambutol in the United States. Plaintiffs' expert Dr. Leffler has no opinion about whether domestic ethambutol sales are themselves "substantial," and he has conducted no analysis of how changes in overseas AB prices affect the price of ethambutol that Lederle sells here. Leffler Dep. 492-93, 495. Moreover, based on the record, there is no reason to suppose that Lederle, the only domestic ethambutol supplier, would have purchased AB from a new supplier like Plaintiffs. As Dr. Leffler noted, Lederle could lose its FDA approval by changing AB suppliers. *Id.* at 47. Furthermore, both Shroff and Miller testified that they never spoke to anyone at Lederle or American Cyanamid about the possibility of selling AB to Lederle. Shroff Dep. 163; Miller Dep. 405. Since the early 1990's, Lederle has satisfied its needs by purchasing an intermediate, D2AB, that its supplier Lupin Laboratories makes in India with AB from Angus. *See* Gupta Dep. 430-31.

The FTAIA explicitly bars antitrust actions alleging restraints in foreign markets for inputs (such as AB) that are used abroad to manufacture downstream products (like ethambutol) that may later be imported into the United States. Clearly, the domestic effects in such a case, if any, would obviously not be "direct," much less "substantial" and "reasonably foreseeable." *Papst Motoren GmbH v. Kanematsu-Goshu, Inc.*, 629 F.Supp. 864, 869 (S.D. N.Y. 1986) ("Papst's alleged restraint on STC in Japan cannot be said to have an anticompetitive effect upon United States commerce based upon [the] later sale of STC manufactured motors in the United States, since jurisdiction over Sherman Act claims "is not supported by every conceivable repercussion of the action objected to on United States commerce.'"); *see also* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 364a (rev. ed. 1995) ("radiating injuries through the economy are far beyond the ability or willingness of antitrust courts to trace and measure").

In *Eurim-Pharm*, the court rejected an attempt to establish jurisdiction by claiming that

restraints abroad "had a spillover effect on domestic commerce" and noted that "[t]his is precisely the type of case Congress sought to eliminate from United States antitrust jurisdiction." *Eurim-Pharm GmbH v. Pfizer, Inc.*, 593 F. Supp. 1102, 1106-07 (S.D.N.Y. 1984). When the court denied Plaintiffs' motion to compel discovery regarding the Lupin Defendants' sales to ethambutol manufacturers, it recognized that claimed effects on a domestic ethambutol market are insufficient to establish subject matter jurisdiction in a case alleging misconduct in overseas markets for products used to manufacture ethambutol. Tr. 40. (Nov. 30, 1999) (Ex. D) ("there is not subject matter jurisdiction, because it winds up with an end product that is different than was sold in Italy"). In view of the foregoing, the court finds that this claim of Plaintiffs' cannot stand.

2.      **Defendants Have Not Stopped Plaintiffs From Making AB.**

Plaintiffs claim that Defendants were the cause of Plaintiffs' failure to sell AB in the United States. Defendants counter that Plaintiffs now are making AB and that Plaintiffs' long delay in making AB was purely a matter of their own business choice.

The record shows that Shroff testified in 1996 that he was waiting for *this* litigation filed by *his* companies to conclude before going forward with AB production. *See, e.g.,* Shroff Dep. 481, 684, 708-09. By March 1999, however, Shroff had determined that his lawsuit was moving too slowly, and he decided to begin making AB. *Id.* at 756-57; *see also* Dave Dep. 92 (Shroff instructed his scientists to begin work on AB in mid-1998). The evidence indicates that UPL has "produced samples [of AB] and [is] working on pilot plant production," using a successful AB process that is "really simple and good" and that requires only "easily available" raw materials. Shroff Dep. 761-62, 767, 770-71; *see also* Dave Dep. 95-101 (raw materials and equipment necessary for UPL to make AB are easily available.) UPL, thus, was prepared to go into full production "as soon as possible." Shroff Dep. 761. Moreover, UPL's general manager of

17

research and development testified that he was confident that UPL can manufacture and sell AB more cheaply than Angus can. Dave. Dep. 104.

Accordingly, this court finds that Plaintiffs' failure to sell AB in the United States was a consequence of Plaintiffs' own business decisions and thus, cannot be considered as an "effect" of any conduct of Defendants.

### C.   A Showing Of The Requisite Effect On Domestic 1-NP Sales Has Not Been Made.

Plaintiffs claim that there is demand for 1-NP in the United States and that Defendants prevented the Indian Plaintiffs from manufacturing 1-NP, which they allege would also have been made with technology provided by Miller-Deltachem. *See, e.g.*, 2d Am. Cmplt. ¶¶ 95, 117(b), 158(b). Defendants, aver, however, that Plaintiffs began to consider manufacturing 1-NP only to fulfill their own requirements for AB production and not for sale in the United States. *Id.* ¶¶ 92-95.

The record demonstrates that Plaintiffs' 1-NP plans were limited to 1-NP production for Plaintiffs' own use to make AB. Angus DC Br. 17-18. For instance, Shroff testified that he did not believe that any other market exists for 1-NP:

Q:   And your intent at the time was to make 1-NP to use as a raw material for the manufacture of AB?

A:   That's right.

Q:   You had no intention of selling 1-NP anywhere else or doing anything with 1-NP other than making –

A:   There's no market.

Q:   There's no market for 1-NP?

A.     I don't think so.

Shroff Dep. 215-16. As a result, Plaintiffs intended to manufacture 1-NP only for their own

account to make AB. *Id.* at 445-46 (Shroff's plan "for the 1-NP that [he] planned to make" was

"[t]o produce for our own requirements," and AB was the "only" product that Shroff "had in

mind" for 1-NP). Moreover, Shroff never investigated any uses for 1-NP other than making AB.

*Id.* at 907. Furthermore, because Plaintiffs had no plans for 1-NP other than for their own use,

they never identified a single potential American consumer for 1-NP. Miller Dep. 368-69.

Shroff testified that in order to make 1-NP, Plaintiffs would need a new plant; however,

they did not "draw up any plans or blueprints" or "have any discussions with contractors or

construction companies." Shroff Dep. 444. Thus, there are no "written business plans or

projections" of any kind involving 1-NP. *Id.* at 445. However, while the record shows that

Plaintiffs did consider purchasing W.R. Grace's ("Grace") nitroparaffins plant in Deer Park,

Texas, Shroff's $5 million offer was considered grossly inadequate because Grace had

determined that $20 million was an appropriate sales price. Neeves Dep. 78, 83, 96; Kiziuk Dep.

192-93. In fact, Plaintiffs' litigation consultant Peter Kiziuk testified that a $5 million offer was

"insufficient" and that anyone who made such an offer [w]asn't a serious contender." Kiziuk

Dep. 192-93.

As demonstrated by the record even though Plaintiffs claim they had no available source

to purchase 1-NP (2d Am. Cmplt ¶ ¶ 92-95), it is unclear whether the Indian Plaintiffs would

have manufactured 1-NP for their own use in the production of AB. There are three other

methods for making AB that do not require 1-NP. Thakore Dep. 336-37; *see also* Dave Dep. 95,

98, 101-102, 106 (describing three ways to make AB without 1-NP). JCM had contracted with

the Indian Plaintiffs to develop a process for making AB that did not require 1-NP. Miller Dep.

415-16, 420; Shroff Dep. 467. Moreover, UPL's general manager of research and development reports that UPL is working on two different methods for making AB that do not involve 1-NP, and it expects to undercut the price of the AB that Angus makes using 1-NP. Dave Dep. 95, 98, 101-02, 104; *see also* Shroff Dep. 766-67, 770-71. Because the Indian Plaintiffs have decided to make AB without 1-NP, Shroff states they have no plans to manufacture 1-NP. Shroff Dep. 773. The court also notes that Plaintiffs' damages expert has not opined that they are entitled to any damages for lost sales of 1-NP. *See* Zmijewski Report 8, 16-19 (DX 297).

This court finds that based upon the record that the Indian Plaintiffs did not have firm plans to manufacture 1-NP and that they intended to manufacture 1-NP only for the purpose of making AB in India and never considered selling it in the United States. Plaintiffs' own 1-NP needs were also uncertain (and are now non-existent) given the alternative methods for producing AB.

Plaintiffs, therefore, cannot sustain their burden under the FTAIA by claiming anticompetitive effects in an alleged domestic 1-NP market. This court finds that it would be speculative to suppose that any alleged conduct that prevented the Indian Plaintiffs from making 1-NP could have had any domestic 1-NP sales, far less a "direct, substantial, and reasonably foreseeable effect" sufficient to give rise to a Sherman Act claim. Such speculation cannot overcome the jurisdictional bar of the FTAIA. *McElderry* v. *Cathay Pacific Airways, Ltd.*, 678 F.Supp. 1071, 1078 (S.D.N.Y. 1988) (domestic effects that were "at best[] speculative" did not satisfy FTAIA); *Liamuiga Tours*, 617 F.Supp. at 925 (dismissing action because "[w]hile the effects in St. Kitts are substantial, at best domestic consequences are speculative").

Furthermore, it bears noting at this juncture that Plaintiffs' assertion that but for the actions of Angus, they would have purchased the Grace nitroparaffins plant, moved it to India,

and then used it to manufacture chemicals there for sale in the United States is unavailing. The record evidence was that Angus played no role in this situation. Even more importantly, the record establishes that Plaintiffs' $5 million offer to purchase the nitroparaffins plant was clearly insufficient. Thus, Plaintiffs were not considered to be serious contenders.

### D. A Showing Of The Requisite Effect On Domestic Sales Of Other Chemicals Has Not Been Made.

Plaintiffs allege in their second amended complaint that Defendants prevented them from manufacturing (1) other basic nitroparaffins in addition to 1-NP (*i.e.*, 2-nitropropane ("2-NP"), nitromethane ("NM"), and nitromethane ("NE")); (2) other nitroparaffin derivatives including tris amino, 2-amino-2-methyl-1-propanol ("AMP"), and bronopol; and (3) a variety of other chemicals, including tertiary butyl amine, guanidine carbonate, phosgene, an ester made from AB "bottoms," a gas scrubbing agent, chloropicrin, and sodium sulfate. *E.g.*, 2d Am. Cmplt. ¶¶ 98-100, 108, 116, 117(c)-(d), 158(d). Defendants, however, assert that Plaintiffs' had no specific plans to manufacture these additional chemicals (i.e., there was no agreement with Miller-Deltachem to develop the technology to manufacture the chemicals) and in fact, Plaintiffs' plans for manufacturing these chemicals were nothing more than speculative.

### 1. Plaintiffs Had No Plans To Manufacture Or Sell Other Nitroparaffins.

Plaintiffs contend that Defendants' scheme to prevent Plaintiffs from manufacturing 1-NP also prevented them from manufacturing other nitroparaffins because "[m]aking 1-NP necessarily entails making" all four of the basic nitroparaffins. Pl.s Br. in Opp'n 17 (filed July 7, 1994). However, as has already discussed, Defendants maintain that Plaintiffs would never have made 1-NP under any circumstances. Rather, the Indian Plaintiffs intended to make 1-NP only to supply their own needs for manufacturing AB, and there are a number of methods for making AB

that do not require 1-NP, including ones the Indian Plaintiffs have used.

The record demonstrates that Plaintiffs would not have manufactured 1-NP by nitrating propane because it generates a large amount of waste material. Miller Dep. 251-52. If Plaintiffs had manufactured 1-NP for their own use, they would have done so using a method that produces no other chemicals. The record further shows that based on Plaintiffs' "production assumptions," they would not have nitrated propane to produce 1-NP. Plaintiffs would have satisfied any needs for other basic nitroparaffins (in particular, NM) on the open market. Zmijewski Report 9-10 (DX 297). Plaintiffs, thus, reached an agreement that Miller-Deltachem would provide the Indian Plaintiffs with technology for manufacturing 1-NP without making other products. Shroff Dep. 394-95, 400.

### 2. Plaintiffs Had No Plans To Manufacture Or Sell Other Nitroparaffin Derivatives.

Plaintiffs allege that they intended to manufacture nitroparaffin derivatives which included, tris amino, bronopol and AMP because these chemicals would have been "natural business expansions" after making AB and 1-NP. Pls. DC Br. 26 n.11. Defendants, contend, however, that Plaintiffs had no actual plan to manufacture these nitroparaffin derivatives.

The evidence demonstrates that Plaintiffs had not plan to manufacture bronopol. For instance, Miller has never done any work on bronopol, and he regards it as "[n]ot certain," but merely a "probability," that Plaintiffs will ever make bronopol, even after AB production begins. Miller Dep. 92-93, 96; *see also* Adams Dep. 57, 69-71 (Shroff rejected bronopol technology offered by his consultant Adams in 1991). Moreover, Shroff completely lost interest in bronopol after discovering that two other Indian companies were already making it: "Usually we produce chemicals where there is hardly any competition." Shroff Dep. 896-97; *see also* Adams Dep. 57,

69-71. Furthermore, Miller "never did any lab work regarding the commercialization" of any other nitroparaffin derivatives listed in the complaint, and he "never did any business plan type document" with respect to these chemicals. Miller Dep. 200, 202.

With regard to tris amino and AMP, the only steps the Indian Plaintiffs took towards manufacturing nitroparaffin derivatives includes a "literature survey," where they were not able to identify a single use or potential buyer for tris amino or AMP. Shroff Dep. 715-16, 718, 902-03. Moreover, a "very preliminary report" of lab work concerning bronopol was never completed. Dave Dep. 175-76; *see also id.* at 121-22 (no "research and development efforts" of any kind regarding other derivatives.) In addition, decisions at UPL about which products to pursue were made by a committee that kept written minutes, and UPL has a policy requiring its scientists to keep written records of any lab work. Dave Dep. 55-58, 61. The record reflects, however, that no documents were produced reflecting a plan to manufacture these chemicals. Furthermore, Miller never discussed his ideas for making AMP with Shroff. Miller Dep. 200, 202.

The evidence further shows that Shroff testified that Plaintiffs are waiting for the conclusion of this litigation before moving forward with their plans to make nitroparaffin derivatives. *See, e.g., id.* at 705-06 ("as soon as this litigation is over we will go ahead"); *id.* at 715-16 (Shroff's company decided to wait until litigation concludes before "mov[ing] forward with its consideration of making" tris amino, bronopol, and AMP); *id.* at 718-19 (AMP plans are on hold because Shroff is "[w]aiting for the litigation to be over"); *id.* at 773-74 (with respect to AMP, tris amino, and bronopol, "[w]e will make it after the litigation is over, but . . . we may go earlier.") The record thus demonstrates that its Plaintiffs' own business decisions that have kept

them from progressing towards making nitroparaffin derivatives.[3]

### 3. Plaintiffs Had No Plans To Manufacture Or Sell The Other Chemicals Named In The Second Amended Complaint.

Plaintiffs allege that they would have manufactured tertiary butyl amine, guanidine carbonate, phosgene, an ester made from AB "bottoms," a gas scrubbing agent, chloropicrin and sodium sulfate if Defendants had not interfered with their attempts to do so. In contrast, Defendants allege that the record clearly shows that Plaintiffs would never have manufactured these chemicals.

The record demonstrates that Plaintiffs engaged in preliminary discussions regarding the manufacturing of these chemicals. For instance, Plaintiffs engaged in some discussion regarding the possibility of manufacturing tertiary butyl amine and agreed to "follow up at a later date" but never did. Miller Dep. 283-84. Plaintiffs also discussed the possibility of making guanidine carbonate in India although they did not discuss any timetable because they were "waiting to do AB first and then move on to other projects." *Id.* at 298. Guanidine carbonate was just "somewhere down the road." *Id.* at 622.

Plaintiffs had not engaged in research and development efforts with respect to most of the

---

[3]Plaintiffs reliance on *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964 (5th Cir. 1977) is, respectfully, inapposite. *See* Pls. DC Br. 26 n.11. In that case, a jury awarded damages to a manufacturer of automobile air conditioners for air conditioner models that it actually made and also for models that it did not make (having been unlawfully excluded from making those). The court held that this issue concerned the "growth . . . of ongoing business" rather than "the expansion of a present business into a new [product] market," and that the plaintiff therefore was not required to show "the preparedness and intent to expand in these areas." *Heatransfer*, 553 F.2d at 986 n.20. By contrast, Plaintiffs' contention here that they would have sold tris amino, bronopol and AMP in this country clearly involves the "expansion" of their business into new product markets. Thus, unlike the plaintiff in *Heatransfer*, Plaintiffs must show "preparedness and intent," which they cannot do.

chemicals. For example, regarding phosgene, Plaintiffs have made no research and development efforts because their factory is located next to a plant that makes phosgene which allows them to receive it through a direct pipe. Shroff Dep. 859. Furthermore, in most instances, Plaintiffs had made no efforts to make or sell the chemicals (*see id.*) and had not identified customers for which the chemicals could be sold. *See, e.g.*, Miller Dep. 637-38.

This court finds that the record demonstrates that Plaintiffs had no plan to manufacture and sell other nitroparaffins, nitroparaffin derivatives and the other chemicals discussed, *supra*, listed in the second amended complaint. Plaintiffs cannot point to any evidence showing that they had developed a plan to manufacture and sell these chemicals in the United States in any quantity, much less quantities that constitute a "substantial effect" on domestic commerce.

The record is also undisputed that Plaintiffs' failure to pursue these manufacturing opportunities had nothing to do with Defendants actions. In fact, Shroff testified that the Angus Defendants had done nothing that would have an affect on whether the Indian Plaintiffs' made these chemicals. Shroff Dep. 857-63; *see also id.* at 863 (between 1992 and 1999, the Indian Plaintiffs introduced "20 new products, and . . . are selling quite a lot in USA" without the Angus Defendants making "any attempt to interfere"). Clearly, Plaintiffs' decision to proceed with the manufacturing of these chemicals is based on their own business judgment. Therefore, Defendants' conduct had no effect on commerce, much less a "direct, substantial, and reasonably foreseeable" effect sufficient to give rise to a Sherman Act claim. *See McElderry*, 678 F.Supp. at 1078 ("speculative" domestic effects insufficient under FTAIA).

### E.    JCM's Alleged Injuries

Plaintiffs assert that Plaintiff JCM sustained injury as a result of Defendants' antitrust conduct. Defendants avow, however, that the FTAIA does not give the court jurisdiction over

JCM's claims on the basis of alleged domestic injuries.

1.  **The Indian Plaintiffs May Not "Piggy-Back" On JCM's Claims.**

In this case, the record demonstrates that the Indian Plaintiffs would have only been injured abroad. First, JCM was not a competitor or a consumer in the nitroparaffins and nitroparaffin derivatives markets which Plaintiffs allege Defendants have monopolized in violation of the Sherman Act. JCM's involvement was as one of two joint venturers in Miller-Deltachem that was allegedly going to sell technology to the Indian Plaintiffs so that they could manufacture chemicals. The contracts between Miller-Deltachem and the Indian Plaintiffs prevented Miller-Deltachem and JCM from using Miller-Deltachem's technology to manufacture the chemicals themselves. *See* AB Technology Sales Agreement ¶ 4.2 (DX 49) ("The Process Technology Package . . . shall be and remain the property of SUCL."); *id.* ¶ 4.5 ("All Process Technology . . . shall be the sole and exclusive property of SUCL . . . MDV will not sell any AB Process Technology to any third party."); 1-NP Technology Sales Agreement ¶ ¶ 4.2, 4.5 (DX 48) (same with respect to 1-NP). Furthermore, the alleged injury to JCM and Miller-Deltachem is that they did not receive payments that they would have earned for providing technology to the Indian Plaintiffs.

Under the FTAIA, when the court's jurisdiction over a Sherman Act claims rests on a claimed "effect . . . on *export* trade or export commerce . . . of a person engaged in such trade or commerce in the United States," the Sherman Act "shall apply to such conduct *only for injury to export business in the United States*," 15 U.S.C. §6a (emphasis added). In other words, "a foreign company cannot demonstrate the domestic injury requirement by piggy-backing onto the injury of a United States exporter." *Optimum*, 926 F.Supp. at 532 (internal quotations omitted). The *Optimum* court thus held that an Argentine firm alleging anticompetitive conduct in an

26

Argentine market "cannot maintain an action under the Sherman Act based merely upon injury to United States exporters attempting to enter the Argentine . . . market." *Id.* at 533. Similarly, in *The 'In' Porters*, the court dismissed a suit brought by a French clothing distributor alleging that the defendants' anticompetitive conduct had caused it to "terminate[] its relationship with a number of United States clothing exporters." *The 'In' Porters, S.A. v. Hanes Printables, Inc.,* 663 F. Supp. 494, 499-500 (M.D.N.C. 1987). This court, therefore, concludes that the Indian Plaintiffs cannot establish FTAIA jurisdiction over JCM's claimed export-related injuries because the FTAIA "requires an actual injury to plaintiff within the United States." *Id.* at 500.

### 2. The Alleged Effects On JCM Could Not "Give Rise" To A Sherman Act Claim.

Defendants allege that Plaintiffs have shown no effect on domestic sales of AB, 1-NP, or any other chemical, and there is no allegation that JCM suffered any domestic injury in the market. To the contrary, JCM's alleged injuries stem from business that Miller-Deltachem allegedly lost as a supplier of technology to chemical manufacturers and as an industry consultant. As the record shows any alleged domestic effects on JCM caused by Defendants' misconduct could not "give[] rise to a claim under the provisions of" the Sherman Act.

The record demonstrates that the effects of Defendants alleged conduct is insufficient to establish an antitrust claim. First, the only markets in which Plaintiffs accuse Defendants of committing monopolization offenses are markets for nitroparaffins and nitroparaffin derivatives. Defendants are not participants in any market for chemical industry consulting services, and Plaintiffs do not allege antitrust violations in any such market.

Second, the record contains no evidence concerning competitive conditions in the market for chemical industry consulting services, and there is no reason to believe that Miller-

Deltachem's alleged injuries as a supplier of such services could reflect any injury to competition in that market, rather than simply injury to Miller-Deltachem itself. Moreover, Plaintiffs' liability expert Dr. Leffler has no opinion "as to how competition has been affected"' by Miller-Deltachem leaving the market altogether. Leffler Dep. 502. "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); *see also, e.g., Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 894 (10th Cir. 1991) (because "the main purpose of the antitrust laws is to preserve and promote competition[,] . . . [w]hether or not a practice violates the antitrust laws is determined by its effect on competition and not its effect on an individual competitor"). Accordingly, the FTAIA requires Plaintiffs to prove "antitrust injury to the market or to competition in general, not merely injury to individuals or individual firms." *McGlinchy*, 845 F.2d at 815.

This court finds that when, as here, antitrust plaintiffs can show at most "injury to themselves, rather than to the relevant market," they have failed to show "the requisite domestic anticompetitive effect," and their claims fail under the FTAIA. *Id.; see also McElderry*, 678 F.Supp. at 1077-78 (plaintiff cannot overcome FTAIA with an "allegation of mere monetary injury," since a "Sherman Act plaintiff must 'show injury to a market or to competition in general, not merely injury to individuals'"). Here, Plaintiffs have not shown the requisite domestic anticompetitive effect regarding JCM's unsupported claims of domestic injury. Clearly, the lack of any "direct, substantial, and reasonably foreseeable" domestic effect sufficient to give rise to a Sherman Act claim bars Plaintiffs' antitrust claims.

### F.     The Cook County Action

Plaintiffs contend that Defendants' (Angus) amended complaint filed in the Cook County

Action operates as an "admission" on the impact on domestic commerce issue. *See* Pls. DC Br. 16-17. Defendants, however, state that Plaintiffs' assertion is erroneous and merely an improper attempt to relieve Plaintiffs of their burden of establishing that Defendants' conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce.

Plaintiffs' "admission" contention cannot prevail. As Plaintiffs' own citations recognize, a pleading from a different action is "not a judicial admission, and thus not binding or conclusive." *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981); *see also Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 364 (7th Cir. 1990) (doubting that doctrine of "men the hold" has any force other than to "bar a contract party from changing his position in [the same] litigation" and declining "to determine . . . whether it applies outside the contract area") (cited as Pls. DC Br. 16-17).

Furthermore, even assuming the admissibility of the Cook County pleading for some purpose(s), it does not show that Plaintiffs must prove that they intended to and were prepared to sell AB, 1-NP, bronopol, tris amino and AMP in the United States. At most, Angus's amended complaint shows that Angus believed their trade secrets were at risk because Plaintiffs intended to use those secrets to manufacture these chemicals abroad.[4] Furthermore, with respect to the principal products at issue in the Cook County action, Angus believed and still believes that Plaintiffs intended to use Angus's trade secrets to manufacture AB in India for sale in India and to manufacture 1-NP for use in manufacturing AB in India. Furthermore, the Cook County

---

[4]Additionally, following further discovery in the Cook County action, Angus filed a second amended complaint (Reply Ex. JJ) *withdrawing* its claims regarding bronopol, tris amino, and AMP. *See Harbor Ins.*, 922 F.2d at 364-65 (cited by Plaintiffs at Pls. DC Br. 17) ("if pretrial discovery or other sources of new information justify a change in a contract party's litigating position," the change could not, under any circumstances, "be deemed a forbidden attempt to 'mend the hold'").

amended complaint contains no allegations about sales of any chemicals in this country.

As demonstrated by the record, it is clear that Plaintiffs never had any significant plan to make AB, 1-NP, bronopol, tris amino, or AMP for sale in the United States. And the subject Cook County pleading contains no suggestion to the contrary.

### G.    Plaintiffs' FTAIA/Nonjurisdictional Contention

Plaintiffs allege that the FTAIA presents a question of substantive law rather than an issue of jurisdiction. Plaintiffs thus assert that their antitrust claims should go to a jury because there are disputed issues of fact concerning the FTAIA and that a reasonable jury could conclude that their claims satisfy the FTAIA. Defendants, however, correctly point out that satisfaction of the FTAIA's requirements is a matter of subject matter jurisdiction. Accordingly, the FTAIA's threshold subject matter jurisdiction issue must first be addressed by the court at this time, not by a jury at trial.

At its essence, the FTAIA concerns the very power of the Court to hear and decide antitrust claims. Case law, and other authorities, uniformly agree that the FTAIA limits the "jurisdiction" of American courts over antitrust claims involving foreign commerce.[5] Stated

---

[5]*See, e.g., Filetech S.A. France Telecom S.A.,* 157 F.3d 922, 931 (2d Cir. 1988) ("FTAIA forbids the exercise of jurisdiction over [certain] Sherman Act violations"); *Caribbean Broadcasting Sys. Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1085 (D.C. Cir. 1998) ("a court has subject matter jurisdiction only to the extent that" the FTAIA is satisfied); *Gushi Bros. Co. v. Bank of Guam,* 28 F.3d 1535, 1544 (9th Cir. 1994) (applying FTAIA standard to claim under the Bank Holding Company Act and holding that the plaintiffs' "failure to establish any anticompetitive domestic effect was jurisdictional"); *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 813 (9th Cir. 1988) (FTAIA "precluded subject matter jurisdiction"); *Filetech S.A. v. France Telecom S.A.,* 1999 WL 92517, at *1 (S.D.N.Y. 1999) ("Within the context of the Sherman Act and the FTAIA, to establish jurisdiction defendant's conduct complained of must" satisfy the FTAIA); *S. Megga Telecoms. Ltd. v. Lucent Technologies, Inc.,* 1997 WL 86413, at *9 (D.Del. 1997) ("plaintiffs fail[ed] to establish subject matter jurisdiction under the FTAIA"); *Galavan Supplements, Ltd. v. Archer Daniels Midland Co.,* 1997 WL 732498, at *1 (N.D. Cal. 1997) ("Under the FTAIA, courts only have jurisdiction over 'conduct involving trade or commerce . . .

differently, legal authorities are consistent in describing the FTAIA issue presented here as one of subject matter jurisdiction.[6]

As the District Judge stated in his prior opinion in this case, "Congress . . . passed the FTAIA to amend the Sherman Act so that *jurisdiction* over foreign commercial conduct would not be exercised unless such conduct had a 'direct, substantial, and reasonably foreseeable effect' on United States commerce." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 1994 WL 577246, at *7, (N.D. Ill. 1994) (emphasis added). The legislative history also compels the same conclusion: it was Congress's "intent . . . to address only . . . *subject matter jurisdiction*" in passing the FTAIA, which "does not affect the legal standards for determining whether conduct violates the antitrust laws." H.R. Rep. No. 686, 97th Cong., 2d Sess., *reprinted in* 1982 U.S. Code Cong. & Ad. News 2487 (emphasis added).

The FTAIA, therefore, clearly presents a jurisdictional question that must be resolved by a court before a case may proceed to a determination regarding its merits. In *Steel Co. v. Citizens*

---

with foreign nations' if that conduct" satisfies the FTAIA); *Optimum, S.A. v. Legent Corp.*, 926 F.Supp. 530, 533 (W.D. Pa. 1996) (dismissing antitrust claims "for lack of subject matter jurisdiction" under FTAIA); *McElderry v. Cathay Pacific Airways Ltd.*, 678 F.Supp. 1071, 1077 (S.D.N.Y. 1988) ("Under the [FTAIA], federal courts do not have jurisdiction" over claims that do not meet its standards); *Papst Motoren GmbH v. Kanematsu-Goshu (U.S.A.) Inc.*, 629 F.Supp. 864, 869 (S.D.N.Y. 1986) (granting "motion to dismiss for lack of subject matter jurisdiction" under FTAIA); *Liamuiga Tours v. Travel Impressions, Ltd.*, 617 F.Supp. 920, 925 (E.D.N.Y. 1985) (claims lacked the "jurisdictional nexus" required by FTAIA); *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494, 499 (M.D.N.C. 1987) (FTAIA "establishes three requirements that an antitrust plaintiff . . . must prove to establish subject matter jurisdiction"); *Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F.Supp. 1102, 1107 (S.D.N.Y. 1984) (granting "motion to dismiss for lack of subject matter jurisdiction" under FTAIA). *See also In re Cooper Antitrust Litig.*, 2000 WL 1521587 (W.D. Wis. Oct. 2, 2000).

[6]Plaintiffs' supplemental citation of *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358 (2nd Cir. 2000), respectfully, is of no aid to Plaintiffs. As is pertinent here, that case merely recites general, generic principles regarding the analytical approach as to whether an issue affects subject matter jurisdiction or the merits. And, factually, *Da Silva*, is a Title VII not an antitrust case.

*for a Better Env't*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Supreme Court explained that "'[w]ithout jurisdiction the court cannot proceed at all in any cause.' . . . The requirement that jurisdiction be established as a threshold matter. . . is 'inflexible and without exception.'" *See also Okoro v. Bohman*, 164 F.3d 1059, 1061 (7th Cir. 1999) ("jurisdictional issues should be addressed first and if they are resolved against jurisdiction the case is at an end and there is no occasion to address the merits"); *Cook v. Winfrey*, 141 F. 3d 322, 325 (7th Cir. 1998) ("a federal court must assure itself that it possesses jurisdiction over the subject matter . . . before it can proceed to take any action respecting the merits.")

Plaintiffs have not cited any real authority to support their claim that the FTAIA "presents a question of substantive law."[7] In fact, Plaintiffs' argument in support of their unprecedented position is to note that the FTAIA does not contain the word "jurisdiction." Plaintiffs further contention that a "reasonable jury could conclude" that their claims satisfy the FTAIA is unavailing because "[t]he court must decide whether jurisdiction exists, not whether there is sufficient evidence to have a trial on the jurisdictional issues." *In re W.L.*, 1999 WL 33878, at *2

---

[7]Plaintiffs' citation to *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993) is misplaced. In explaining that the district court there "undoubtedly *had jurisdiction*," the Court included a footnote describing the FTAIA and noted that "the conduct alleged plainly meets [the FTAIA's] requirements." *Hartford Fire*, 509 U.S. at 795-96 & n.23 (emphasis added). The Supreme Court's reference to the FTAIA in its explanation that subject matter jurisdiction was uncontested and firmly established only confirms that the FTAIA sets forth standards governing the jurisdiction of American courts over foreign antitrust actions. Like *every* other relevant authority, *Hartford Fire* demonstrates that the FTAIA is jurisdictional.

On a different *Hartford Fire* issue raised by Plaintiffs: Plaintiffs also claim that, under *Hartford Fire*, they need only show a "substantial effect in the United States" to pursue their antitrust claims, and not the "direct, substantial and reasonably foreseeable effect" required by the FTAIA. But as noted above, even *arguendo* if the *Hartford* standard is applied, for all the same reasons that the undisputed record shows no "direct, substantial, and reasonably foreseeable effect" on domestic commerce under the FTAIA, the record shows no "substantial effect" on domestic commerce under the test proposed.

n.2 (N.D. Ill. 1999). Moreover, "disputes over material facts will not preclude the district court from determining the jurisdictional issue." *Lumpkin v. United States*, 791 F.Supp.747, 749 (N.D. Ill. 1992). Therefore, questions of jurisdiction must be determined by the court and not by a jury (*see, e.g., Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537-38, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995)), and "no case can properly go to trial if the court is not satisfied that it has jurisdiction." *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir. 1986).

This court finds that given the case law and legislative history that it is clear that the FTAIA is a matter of subject matter jurisdiction that limits the jurisdiction of American courts over antitrust claims involving foreign commerce. Thus, any disputed facts regarding the court's subject matter jurisdiction must be resolved by the court at this time. *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998) (district court erred in failing to resolve factual disputes concerning jurisdiction under the FTAIA before reaching other issues).[8]

## II.    FTAIA Applicability

Plaintiffs argue that the FTAIA is not applicable in this case because they would have been involved in exporting chemicals from India into the United States but for the alleged antitrust violations. Pls. DC Br. 35-37. Defendants counter that Plaintiffs' argument is both incorrect and irrelevant.

In asserting their theory, Plaintiffs rely on the FTAIA's introductory language, which states that the FTAIA's requirement of a "direct, substantial, and reasonably foreseeable effect" on domestic commerce applies to claims "involving trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C. § 6a. Based on this language, Plaintiffs

---

[8]Relevantly, *see also* citation and quotation at Footnote 1 herein, p. 5, *supra*.

assert that the parenthetical exclusion of "import trade or import commerce" means that a foreign antitrust claim need never satisfy the FTAIA as long as it involves products that might be shipped to the United States. It is therefore, Plaintiffs' contention that if a foreign antitrust plaintiff merely alleges that it would have exported goods to the United States, then the FTAIA requirement would not apply.

The court determines that Plaintiffs' position is not a correct statement of the law. The "main significance" of the FTAIA is to "make[] clear that the concern of the antitrust laws is protection of *American* consumers and *American* exporters, not foreign consumers or producers" — a concern that is "triggered by direct, substantial, and reasonably foreseeable effects on United States commerce, not by any minor impact." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272h2, at 362-63 (1997) (emphasis in original); *see also The 'In' Porters, S.A.*, 663 F.Supp. at 499. The antitrust laws' goal of protecting American consumers and producers cannot realistically be served by Plaintiffs' version of the FTAIA, which would permit foreign plaintiffs to bring treble damages suits based on conduct that has only indirect, insubstantial, and unforeseeable effects on commerce in this country.

Accordingly, Plaintiffs' theory has been consistently rejected by the courts, which have recognized that "the 'import trade or import commerce' exception to the FTAIA applies *only to domestic importers*." *S. Megga Telecomms. Ltd. v. Lucent Technologies, Inc.*, 1997 WL 86413, at *8 n.22 (D.Del. 1997) (Reply Ex. AAA) (emphasis added); *accord Coors Brewing Co. v. Miller Brewing Co.*, 889 F.Supp. 1394, 1398 (D.Colo. 1995) (FTAIA applies to antitrust claims involving foreign markets "with the exception of claims brought by *domestic importers*") (emphasis added); *The 'In' Porters*, 663 F.Supp. at 499 (FTAIA "establishes . . . requirements that an antitrust plaintiff, other than a *domestic importer*, must prove to establish subject matter

jurisdiction) (emphasis added); *see also Papst Motoren GmbH*, 629 F.Supp. at 864 (FTAIA required dismissal of antitrust claims alleging restraints abroad claimed to affect products shipped to the United States). These courts have, thus, held that the FTAIA exempts those claims that involve the business of United States firms that import goods into the United States and not all claims involving the export of goods to the United States from abroad or all claims involving goods may eventually be shipped to the United States.[9]

Plaintiffs' theory is further belied by the language of the FTAIA because one way in which a plaintiff can show the requisite "direct, substantial, and reasonably foreseeable effect" on domestic commerce is by showing such an effect on "import trade or import commerce with foreign nations." 15 U.S.C. § 6a(1)(A). If Plaintiffs' theory were correct, this would mean that all import-related antitrust claims would be immune from the FTAIA and such a statutory interpretation is not permissible. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (statutes "must, if possible, be construed in such fashion that every word has some operative effect"); *United States v. Ranum*, 96 F.3d 1029, 1030 (7th Cir. 1996). Furthermore, a leading treatise explains, while the FTAIA's language may be

---

[9]The legislative history that Plaintiffs cite is not inconsistent with all this case law. The legislative history does not describe the FTAIA as exempting from its coverage all claims involving goods shipped to the United States, but only claims involving "import transactions (*see* Pls. DC Br. 36-37) – *i.e.*, the business of domestic firms importing goods into the United States.

The only case that even remotely supports Plaintiffs' position is *Eskofot A/S v. E.I. du Pont de Nemours & Co.*, 872 F.Supp 81 (S.D.N.Y. 1995). However, more recent decisions have declined to follow its flawed analysis, which conflicts with the great weight of authority. *See S. Megga*, 1997 WL 86413, at *8 n.22. Plaintiffs' additional citations of *Hartford Fire and Eurim-Pharm* do not assist them. *See* Pls. DC Br. 37. *Hartford Fire* said nothing at all about the exception for import transactions. *Eurim-Pharm* also did not address the issue and, in any event, the *dicta* quoted by Plaintiffs refers, like the legislative history, only to "import transactions," which limits the exception's scope to claims brought by domestic importers. *See Eurim-Pharm*, 593 F.Supp. at 1106.

"cumbersome and inelegant," it plainly "means that the antitrust laws do not apply to domestic or foreign commerce affecting foreign markets, consumers or producers unless there is a direct, substantial, and reasonably foreseeable effect on the *domestic* market." Phillip Areeda & Herbert Hovemkamp, *Antitrust Law* ¶ 272h2 (1997) (emphasis in original).

In short, the court finds that the FTAIA is applicable to the case herein.

## CONCLUSION[10]

In view of the foregoing, Defendants' motion to dismiss Counts I and II of the second amended complaint for lack of subject matter jurisdiction is granted.[11]

Too, because the court does not have original subject matter jurisdiction over Plaintiffs' federal claim(s), the Court has no (and thus declines to exercise) supplemental jurisdiction over Plaintiffs' state law tortious interference claim (Count III). 28 U.S.C. § 1367(a); *Pinney Dock and Transp. Co. v. Penn. Cent. Corp.*, 196 F.3d 617, 621 (6th Cir. 1999); *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361 (2nd Cir. 2000); *In re Copper Antitrust Litig.*, 2000 WL 1521587, at *2 (W.D. Wis. Oct. 2, 2000); *see Wellness Community Nat'l v. Wellness House*, 70 F.3d 46, 50 (7th Cir. 1995).

---

[10]The court reviewed and considered all of the points raised by the Plaintiffs, including some that were found impracticable and unnecessary to be addressed herein. The court is mindful, too, that Plaintiffs also addressed the subject motion to dismiss issues in Plaintiffs' motion for partial summary judgment brief and reply. The court did review and consider all of Plaintiffs' arguments as to the subject motions to dismiss that were contained in the described partial summary judgment briefs of the Plaintiffs.
Also, the court has reviewed Plaintiffs' sur-reply memorandum in opposition and finds nothing therein that would impact on the count's motion decision here.

[11]In view of the court's ruling, it's unnecessary to consider the other motion argument(s) of the Defendants under Counts I and II of the second amended complaint.

ENTER:

IAN H. LEVIN
**United States Magistrate Judge**

Dated: February 16, 2001